**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| Glenpointe Associates, III, | : | |
| A New Jersey General Partnership, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Civil Action 06-cv-1690 (DRD) |
| v. | : | |
| | : | **OPINION** |
| Regency Savings Bank and | : | |
| Park National Bank, | : | |
| | : | |
| Defendants. | : | |
| | **:** | |

**APPEARANCES BY:**

Russell J. Passamano, Esq.
DECOTIIS, FITZPATRICK, COLE & WISLER, LLP
500 Glenpointe Centre West
Teaneck, NJ  07666

  *Attorney for Plaintiff, Glenpointe Associates, III, a New Jersey General Partnership*

John P. Mitchell, Esq.
DRINKER, BIDDLE & REATH LLP
105 College Road East - Suite 300
PO Box 627
Princeton, NJ 08542-0627

  *Attorney for Defendants, Regency Savings Bank and Park National Bank*

Walter John Fleishcher, Jr., Esq.
DRINKER BIDDLE & REATH LLP
500 Campus Drive
Florham Park, NJ 07932-1047

  *Attorney for Defendant, Regency Savings Bank and Park National Bank*

**DEBEVOISE, Senior District Judge**

## INTRODUCTION

Before the Court is Defendants' Motion for Summary Judgment seeking dismissal of Plaintiff's complaint.  This is a contract action concerning the interpretation and application of a prepayment premium clause governing early repayment of Plaintiff's mortgage loan.  In its complaint, Plaintiff, Glenpointe Associates, III ("Glenpointe"), claims that Defendants, Regency Savings Bank and Park National Bank (collectively referred to as "Park"),  misinterpreted two sentences of the prepayment premium clause, which resulted in miscalculation of the penalty to be paid.  As a consequence of Park's misinterpretation and miscalculation, Glenpointe asserts that it was erroneously required to pay a premium for the last 60 days of the loan period, October 1, 2006 through December 1, 2006.

The issue is whether the prepayment premium clause is clear on its face and susceptible to only one reading, thereby requiring  payment of a premium on the loan for the entire loan period when prepayment is made prior to October 1, 2006.

## BACKGROUND

On November 27, 1996,  Teachers Insurance and Annuity Association of America ("TIAA"), as mortgagee, and Glenpointe, as mortgagor, executed a Mortgage Note ("Note") in the amount of $30,000,000.00 ("Loan") and bearing interest at the rate of 9.80 percent.  (See Affidavit of David Daniel ("Daniel Aff."), dated August 1, 2006, Ex. A, Mortgage Note, at 1).  The Note was secured by a Mortgage and Security Agreement ("Security Agreement"), executed by TIAA and Glenpointe on the same date, that encumbered a property in Teaneck, New Jersey.  (Daniel Aff., Ex. B at 1).

2

Subsequently,[1] TIAA assigned to Park all of its right, title, and interest in and to the Note and the Security Agreement.  (Daniel Aff. at 2).

The Note provided for repayment of the Loan in monthly installments of $277,402.50, consisting of principal and interest, from December 1, 1996 to November 1, 2006, with the balance due on December 1, 2006.  (Daniel Aff. Ex. A at 1-2).  The Note also contained the following provision governing early repayment of the Loan, which, here for ease of reference, has been separated into sentences:

Sentence one provides that:

> Maker shall have no right to prepay this Note, in whole or in part, prior to the first day of December, 2001.

Sentence two provides that:

> Thereafter, in addition to the payments on account of principal set forth above, the privilege is reserved to prepay this Note in full, but not in part, on any installment payment date commencing on the first day of December 2001 and upon ninety (90) days prior written notice and upon payment of a premium equal to the greater of (I) One (1%) Percent (the "Prepayment Percentage") times the outstanding principal balance of this Note on the date of prepayment (the "Prepayment Date Principal") or (ii) the amount by which the sum of the Discounted Values of Note Payments calculated at the Discount Rate (as both such terms are defined below), exceeds the Prepayment Date Principal.

Sentence three provides that:

> In addition to the foregoing, this Note may be prepaid in full, but not in part, without payment of a premium, on any installment payment date beginning with October 1, 2006.

(See Daniel Aff. Ex. A at 2).

When, in October 2005, Glenpointe sought to pay off the Note, Park, in accordance with its

---

[1]Plaintiff was provided with a notice of the assignment which was dated October 23, 2003.  (See Pl.'s Civ. Compl. L1708-06 filed N.J. Super. Ct., Bergen County (3/01/06)).

3

interpretation of the prepayment premium clause, prepared a "Yield Maintenance Calculation for Prepayment Premium" for payment effective December 1, 2005.  According to Park, because Glenpointe's payment was to be made prior to October 1, 2006, the amount due was calculated based on the formula in sentence two.  In its calculation, Park did not allow for waiver of the premium as provided in sentence three because payment was to be made before October 1, 2006.

The following chart illustrates, per monthly installment period, the payment due, which when discounted by the percentage rate, results in the present value of the payment due.

| PERIOD | PAYMENTS ($) | DISCOUNTS RATE (%) | PRESENT VALUE ($) |
|---|---|---|---|
| 1.    Dec-05 | 277,402.50 | 0.3533 | 276,425.80 |
| 2.    Jan-06 | 277,402.50 | 0.3533 | 275,452.53 |
| 3.    Feb-06 | 277,402.50 | 0.3533 | 274,482.69 |
| 4.    Mar-06 | 277,402.50 | 0.3533 | 273,516.27 |
| 5.    Apr-06 | 277,402.50 | 0.3533 | 272,553.26 |
| 6.    May-06 | 277,402.50 | 0.3533 | 271,593.61 |
| 7.    Jun-06 | 277,402.50 | 0.3533 | 270,637.36 |
| 8.    Jul-06 | 277,402.50 | 0.3533 | 269,684.48 |
| 9.    Aug-06 | 277,402.50 | 0.3533 | 268,734.95 |
| 10. Sep-06 | 277,402.50 | 0.3533 | 267,788.76 |
| 11. Oct-06 | 277,402.50 | 0.3533 | 266,845.90 |
| 12. Nov-06 | 277,402.50 | 0.3533 | 265,906.37 |
| 13. Dec-06 | 23,715,709.33 | 0.3533 | 22,652,841.45 |
|  |  |  |  |
| Sum Total of Present | Value Payments |  | 25,906,463.42 |
| Less Current | Principal Balance |  | (24,571,261.56) |
| Total Prepayment | Premium |  | 1,335,201.86 |

(See Daniel Aff. , Ex. C at 1).

Park calculated the total prepayment premium to be $1, 335, 201.86 as of December 1, 2005 through the end of the Loan period, December 1, 2006.  Because this amount exceeded one percent (1%) of the balance of the Prepayment Date Principal of $24,571,261.56, Park required Glenpointe to pay the higher amount calculated.  (Daniel Aff. at 4).  On October 31, 2005, following payment in full of the loan balance by Glenpointe, Park cancelled the Security Agreement.  (Id.).

By letter to Park dated January 11, 2006, Glenpointe demanded reimbursement of the premium it had paid for October 1, 2006 through December 1, 2006, claiming that it was charged improperly.  To support its claim, Glenpointe cites the language of sentence three of the prepayment premium clause that the Note may be prepaid "without payment of a premium, on any installment payment date, beginning with October 1, 2006".   (Daniel Aff. Ex. D at 1).

Park declined to reimburse Glenpointe, and, as a result, on March 1, 2006, Glenpointe filed a contract action in New Jersey Superior Court[2] alleging Park's breach of contract, breach of covenant of good faith and fair dealing, and unjust enrichment.   In addition to requesting the imposition of a constructive trust, Glenpointe seeks compensatory damages, attorney's fees, preliminary and permanent injunctive relief, and other relief as the Court deems just and proper.

Park removed the action to this Court and, thereafter, filed the Motion for Summary Judgment seeking to dismiss Glenpointe's complaint.  Glenpointe opposes Park's motion.

---

[2]Law Division, Bergen County, entitled Glenpointe Associates, III v. Regency Savings Bank (BER-L-1708-06).

5

## ANALYSIS

**The Summary Judgment Standard**

Summary judgment will be granted if the record establishes that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) imposes a burden on the moving party simply to point out to the district court that there is an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met this burden, the burden then shifts to the non-moving party. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Moreover, the nonmoving party may not simply "replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)). Rather, he must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. Id. at 247. In determining whether there exists a material issue of disputed fact, however, the facts and the inferences to be drawn from the facts are to be viewed in the light most favorable to the nonmoving party. Pollock v. Am. Tel. & Tel. Long Lines, 794 F.2d 860, 864 (3d Cir. 1986). A genuine issue for trial exists where "the party opposing the motion can adduce evidence which, when considered

6

in light of that party's burden of proof at trial, could be the basis for a jury finding in that party's favor." J.E. Mamiye & Sons, Inc. V. Fidelity Bank, 813 F.2d 610, 618 (3d Cir. 1987) (Becker, J. concurring).

**The Contract Law Issue**

The dispositive issue, however, is a question of contract law, specifically the interpretation and application of the last two sentences[3] of the prepayment premium clause of the Note which deal with the calculation of the balance due upon early termination of the loan.

Park argues that the language of the Note's prepayment premium clause is plain in meaning and unambiguous on its face, lending itself to only one interpretation. According to Park, the clause establishes three bright-line time frames which govern prepayment of the loan: (1) sentence one of the clause prohibits any prepayment of the loan before December 1, 2001; (2) sentence three of the clause permits prepayment of the loan without any premium payment at all on or after October 1, 2006; and, (3)  sentence two, covering the gap between the date in sentence one, December 1, 2001, and the date in sentence three, October 1, 2006, permits Glenpointe to prepay the loan, but also requires payment of a premium calculated on the total amount of remaining payments through December 1, 2006.

Park contends that, because the language of the prepayment premium clause of the Note is unambiguous and lends itself to only one interpretation, "construction [of the contract] is not permitted or required" by the court and the court is to give "the words . . . their 'plain and ordinary meaning'." Regency Oldsmobile, Inc. v. General Motors Corp., 1988 U.S. Dist. LEXIS 3505, at *10 - *11 (D.N.J. Apr. 19, 1988) (granting summary judgment and recognizing that "[a] contract is

---

[3]Supra at 3.

ambiguous only if it is reasonably and fairly susceptible of more than one meaning. . . . [O]nce it is determined that the contract is unambiguous, it is the duty of the court to construe the contract from its four corners as a matter of law without resort to extrinsic evidence.").

According to Park, Glenpointe's interpretation is without foundation and inconsistent with the plain language of the clause because nothing in sentence two indicates that the parties intended to exclude any premium payments if the loan was paid off between December 1, 2001 and October 1, 2006.

Park argues that, under the circumstances presented here, it is appropriate for the court to grant summary judgment as a matter of law. Palm Bay Imports, Inc. v. Miron, 55 Fed. Appx. 52, 58-59 (3d Cir. 2002) (affirming the District Court's dismissal of the plaintiff's claims and holding that "the plain text of the Agreement fails to support [the plaintiff's] interpretation.").

Further, Park accuses Glenpointe of attempting to "cherry-pick the best of both prepayment scenarios," by applying the benefit of the 2006 no premium provision to its 2005 early payment. See Br. in Supp. of Defs.' Mot. for Summ. J. at 1. Park points out that it is not the Court's role to rewrite the contract or to create a contract different from that into which the parties entered. Kampf v. Franklin Life Ins. Co., 33 N.J. 36, 43 (1960) ( "it is the function of a court to enforce [the contract] as written and not to make a better contract for either of the parties.").

Conversely, Glenpointe urges the court to deny Park's motion for summary judgment. Glenpointe asserts that a determination by the trier of fact is appropriate because, not only is the language is capable of more than one interpretation as evidenced by the instant dispute, but also that Park's interpretation of that language is inconsistent with the repayment terms of the Note as they are customarily understood and applied in the industry. The January 11, 2006 letter to David Daniel

captures the essence of Glenpointe's argument:

> [t]he plain language of the Note states that after December 1, 2001, the Note may be prepaid in full, "without payment of a premium, on any installment payment date, beginning with October 1, 2006." <u>See</u> Note p. 2.  It is apparent that the quoted language requires that the period beginning with October 1, 2006, be excluded when calculating any prepayment penalty.  Since that period was, in fact, improperly included in the calculation, a refund is now due and owing to Glenpointe.

**The Contract Language Interpretation Standard**

The interpretation or construction of a contract is a legal question suitable for a decision on a motion for summary judgment by the court.  <u>See</u> <u>Brill v. Guardian Life Ins. Co. of Am.</u>, 142 N.J. 520 (1995).  "The interpretation of the terms of a contract are decided by the court as a matter of law unless the meaning is both unclear and dependent on conflicting testimony."  <u>See</u> <u>Great Atl. & Pac. Tea Co., Inc. v. Checchio</u>, 335 N.J. Super. 495, 502 (App. Div. 2000) (citation omitted).

In interpreting a contract the primary objective of the court is to derive the objective intent of the parties at the time of the contract was made.  The Court of Appeals has held that "[i]n construing a contract, a court's paramount consideration is the intent of the parties." <u>See</u> <u>Mellon Bank, N.A. v. Aetna Business Credit, Inc.</u>, 619 F.2d 1001, 1009 (3d Cir. 1980) (citation omitted).  In determining the intent of the contracting parties, the court is, however, concerned with the "objective manifestations" of their intent.  <u>Id.</u>

To assist the court in making a determination of intent, the parties may be permitted to offer evidence which illuminates their objective intent.  The Court of Appeals favors a more comprehensive analysis which encompasses the language of the contract and evidence offered by

the parties, instead of an approach that limits a court's review to the "four corners" of the contract.  Senior Executive Benefit Plan Participants v. New Valley Corp. (In re New Valley Corp.), 89 F.3d 143, 149-150 (3d Cir. 1996).

Under that approach, before language in a contract is considered ambiguous, the court is to "hear the proffer of the parties and determine if there is objective indicia that, from the linguistic reference point of the parties, the terms of the contract are susceptible of different meanings."  Mellon Bank, 619 F.2d at 1011.  In light of this, a contract is not ambiguous merely because the parties disagree about the construction of its terms, but only where the contract terms are susceptible of two different interpretations or more than one meaning.  Id.

In assessing the contract language, a court may consider the language of the contract, the alternative interpretations suggested by counsel, and the nature of the extrinsic evidence offered to support of each interpretation.  Id.  Extrinsic evidence which may be offered in support of a party's position about the meaning of language in the contract includes: (1) "the structure of the contract;" (2) "the bargaining history" of the parties; and (3) "the conduct of the parties that reflects their understanding of the contract's meaning."  New Valley, 89 F.3d at 150.

Extrinsic evidence, however, is important only to the extent that it provides "objective indicia that . . . the terms of the contract are susceptible of different meanings."  See Am. Cyanamid Co v. Fermenta Animal Health Co., 54 F.3d 177, 181 (3d Cir. 1995).  The Court of Appeals cautions that "[t]he strongest external sign of agreement between contracting parties is the words they use in their written contract."  Mellon Bank, 619 F.2d at 1009.  The words of the written contract should be given their plain and ordinary meaning.  Id.

10

In making a determination concerning the clarity or ambiguity of the contract terms, the Court should avoid interpreting contractual language in a way that renders any term of the contract meaningless or superfluous.  Penske Logistics, Inc. V. KLLM, Inc., 285 F. Supp. 2d 468, 474 (D.N.J. 2003) ("[u]nder the principles of contract interpretation, a contract should not be given an interpretation which renders a term or terms superfluous or meaningless. . . .").  See also Restatement (Second) of Contracts, § 203 ("[A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect. . . .").  Because "[t]he strongest external sign of agreement between contracting parties is the words they use in their written contract . . . a court will make no inference or give any construction to the terms of a written contract that may be in conflict with the clearly expressed language of the written agreement.  Mellon, 619 F.2d at 1009. The Court of Appeals' approach, however, does not authorize a trial judge to demote the written word to a reduced status in a contract interpretation. . . . [C]ertain words attain binding definition. . . . Dates, numbers, and the like generally cannot be varied."  Id. at 1013.

Here, the Court is not persuaded by Glenpointe's argument that the prepayment premium clause is ambiguous and susceptible to another meaning.  The words of the clause are definite and clear.  Glenpointe's interpretation is predicated on a construction that the dates in the clause reference "months going into the yield maintenance calculation," which it purports to be a "fairly common" provision in the commercial loan industry.[4]  Glenpointe asserts that the original Lender, TIAA, sought to protect its interest only up to October 1, 2006.  Colardi Aff. at ¶ 8.  Therefore,

---

[4]See John Colardi Aff. in Opp'n to the Defs.' Mot. for Summ.  J. ("Colardi Aff.") at ¶ 5.

according to Glenpointe, the bargained for return on the prepayment did not include the period from October 1, 2006 through December 1, 2006 and no penalty is due for October 2006 and November 2006 when prepayment is made after December 1, 2001.  Colardi Aff. at ¶ 13.

Glenpointe asserts that the proper interpretation of sentence three is that "no premium is due for any 'installment payment date, beginning with October 1, 2006'."  Colardi Aff. at § 13. Glenpointe urges the Court to conclude that this is not a reference to time, but to "months going into the yield maintenance calculation." Colardi Aff. at ¶ 14.  Glenpointe has not, however, provided any evidence that the meaning they now assert is the meaning understood by TIAA at the time the contract was formed.

The plain and ordinary meaning of the words used in the clause clearly describes time. Sentence one references time in that prepayment is prohibited "prior to the first day of December, 2001." Sentence two references time in that prepayment of the Note can be made "commencing on the first day of December 2001" provided that "ninety (90) days prior written notice" is given. Likewise, sentence three references time in that "beginning with October 1, 2006," the Note may be "prepaid . . . without payment of a premium."

Glenpointe's hypothetical, which states that "[Park] is suggesting that a one month difference in payment date results in a three month difference in yield maintenance penalty payments" fails to prove their point.  One month does make a difference.  Glenpointe does not, and cannot, argue that it could not prepay the Loan one month earlier than the language in sentence one allows.  Clearly, they are prohibited from prepayment in November 2001, which is "prior to the first day of December, 2001."  The Court, therefore, rejects Glenpointe's assertion that the sentences of the

clauses reference something other than dates.  Such a construction would conflict with the clearly expressed language of the written agreement and would vary the clear expression of time through the use of calendar dates.

     After having carefully examined the contract clause in question, and after having reviewed the arguments set forth in the briefs and the affidavits submitted by the parties, and after hearing oral argument, this Court has reached the conclusion that the prepayment premium clause at issue is clear on its face and not susceptible to more than one interpretation, as Park suggests.  Glenpointe, as the non-moving party, has provided only a bald allegation that the words of the prepayment premium clause are something other than the clear language written into the Note.  Because Glenpointe has failed to establish that there is a genuine issue of fact for trial, the Court grants Park's motion for summary judgment as a matter of law and dismisses with prejudice Plaintiff's complaint.

## CONCLUSION

     Because the prepayment premium clause at issue is unambiguous and lends itself to only one interpretation, Park's motion for summary judgment as a matter of law is granted and Plaintiff's complaint is dismissed with prejudice.  The Court will issue an appropriate Order.

                /s/ Dickinson R. Debevoise
                Dickinson R. Debevoise, U.S.S.D.J.

Dated: September 25, 2006

14